FILED

2014 FEB 10 AM 11:48

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PATRICK RYAN BRAY,
Plaintiff,

Vs.

BANK OF AMERICA,
Defendant

CASE NO.: 8:14-CV-332-T-23TBM

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF
JURY TRIAL DEMANDED

**COMPLAINT**

Comes now Plaintiff, PATRICK RYAN BRAY pro se, sues Defendant, BANK OF AMERICA, and states as follows:

**GENERAL ALLEGATIONS**

1. Defendant, Bank of America ("therefore and herein will be referred to as Defendant"), is a Foreign Corporation engaged in business in Hillsborough County, Florida.

2. Plaintiff, Patrick Ryan Bray ("therefore and herein will be referred to as Plaintiff"), was a former employee of Defendant and is a resident of Manatee County, Florida.

3. At most times relevant hereto, Plaintiff was an employee of Defendant working at 200 Central Ave., 10th Floor, Saint Petersburg, Pinellas County, Florida.

4. From March 2010 until October 2011 Plaintiff was a dual employee of Merrill Lynch ("therefore and hereto will be referred to as Subsidiary") and Defendant.

5. At all times relevant hereto, Defendant engaged in an industry affecting commerce and employed more than fifteen (15) regular employees.

6. At all times relevant hereto, Plaintiff's performance was more than satisfactory, and when Plaintiff terminated employment with Defendant he had a clear employment file with zero ( 0 ) write-ups or reprimands.

7. Prior to Plaintiff's employment with Defendant, Plaintiff maintained a relationship with InteliSpend Prepaid Solutions (" therefore and herein will be referred to as the Client") for six ( 6 ) years which was formerly known as American Express Incentive Services (AEIS). The relationship began in early 2004 with an investment in Bond Mutual Funds of ten million dollars ($10,000,000), for Plaintiff to manage. Throughout this relationship with Client the Plaintiff was an independent Financial Advisor.

8. When Plaintiff was hired by Defendant in March of 2010 the portfolio of Client that the Plaintiff managed had a value of approximately forty – five million dollars ($45,000,000).

9. Plaintiff's relationship with Client because of its intricacies, consumed the majority of his time, and therefore represented a significant portion of his book of business.

10. For all times relevant hereto, the Client had a parent company, Maritz LLC ("therefore and herein will be referred to as Maritz"), which Defendant was the lead lender and acted as the Administrative Agent for a six (6) bank syndicated loan for Maritz that renews every two years or so.

11. Plaintiff was forced to leave his career as an Independent Financial Advisor in March 2010 if he wanted to maintain managing the assets of the Client, and join the Defendant and its Subsidiary due to an explicit and implicit tying arrangement by the Defendant through its employees, Stephen Bode, Kevin Knopf, and Patricia Watson ("therefore and herein will be referred to as Defendant's Employee(s)") for the loan referenced in paragraph 10.

12. Throughout Plaintiff's employment with Defendant and after he was continually harassed and defamed by both libel and slander by Defendant's Employee(s).

13. On many occasions Plaintiff made his immediate supervisors Brian Ludwick and Sean Farrell ("therefore and herein will be referred to as Immediate Supervisors") aware of the allegations made in paragraphs eleven and twelve (11 – 12) both verbally and by email.

14. Plaintiff's work environment with regard to his ability to manage his Client's assets became so untenable that he terminated employment from Defendant and its Subsidiary in October 2011.

15. At the time of Plaintiff's resignation from Defendant the Assets Under Management (AUM) for Client was approximately seventy million ($70,000,000). Being billed at 65 basis points (.65%). For a total billable revenue for Defendant and its Subsidiary from Client of approximately four hundred and fifty five thousand ($455,000) per annum for Plaintiff's management and services.

**Count I**
Tying of Assets

16. Plaintiff realleges paragraphs 1-15 as if fully alleged herein.

17. Plaintiff brings this action on the statutory basis under section 1972 of the Bank Holding Company Act (BHCA).

18. Section 106(b) of the Bank Holding Act Amendments of 1970, 12 U.S.C. § 1972(1) (1977 & Supp. IV 1981). § 1972. Tying arrangements prohibited;

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement –

(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

(B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;

(D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company or

(E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

19. The statutory basis for providing standing in treble damage suits under the BHCA is Section 1975. This section states in relevant part as follows:

> *Any person who is injured in his business or property* by reasons of anything forbidden in Section 1972 of this title may sue therefore...and shall be entitled to recover three (3) times the amount of damages sustained by him and the cost of suit, including reasonable attorneys fees.

20. On or around March of 2010 Defendant was the lead lender of a six (6) bank syndicated line of credit being renewed for Maritz.

21. The Defendant was also acting as the Administrative Agent for the syndicated loan.

22. For Plaintiff's entire relationship prior to March of 2010 with Client, the Client was owned by Maritz with majority ownership and American Express with minority.

23. The credit line was renewed through the syndication but had an explicit clause in the loan documents of Defendant that stated that if at any time Maritz purchased the minority shares of Plaintiff's Client from American Express then all monies held in bonds that Plaintiff managed would be required to be moved to Defendant's Subsidiary

within forty-five (45) days.

24. This same demand was in the Defendant's letter to Maritz acting as the Administrative Agent for the syndication.

25. Sometime in late February of 2010 Maritz had agreed to purchase the minority shares of Plaintiff's Client from American Express and closed the acquisition.

26. The Defendant's Employee(s) had a conversation with officers of both Plaintiff's Client and Maritz where it was expressed by them to Defendant that they wanted to maintain the relationship with Plaintiff and have him continue to manage the bond assets rather than be forced to move to Defendant's Subsidiary. During this call it was stated by Defendant Employee(s) that this would violate "The Spirit of the Agreement" if the assets did not transfer within 45 days.

27. The Defendant also has stated under oath that one of the primary reasons that the assets under the management of the Plaintiff needed to be moved to Defendant's Subsidiary was to be able to monitor the assets more effectively.

28. Defendant failed to mention to Client or Maritz that there is a firewall between the Bank Holding Company and the Administrative Agent that forbids the viewing of said assets held at its Subsidiary and that the only reporting given back to Defendant would be a monthly statement sent to them.

29. Defendant has clear training material for its employees on what constitutes a traditional bank product to avoid anti- tying violations of the BHCA. Bonds and bond mutual funds are not on the list nor is broker dealer services from a subsidiary.

30. Defendant has an actual list of un-approved products and services that would be a violation of Section 106 of the BHCA and the products and services described in paragraph 29 are on Defendants list of prohibited products and services.

31. Defendant has a policy that for further interpretation of these policies, employees must consult internal counsel prior to tying un-approved products.

32. Defendant Employee(s) have admitted under oath to not consulting Defendant's internal counsel regarding the assets in question here but instead only went to outside counsel for aid in writing the loan documents.

33. Defendant's Employee(s) have stated that another reason the assets needed to be held at its Subsidiary was for safety from fear other institutions holding the money could go out of business after the financial crisis.

34. Plaintiff states to the Court that no company that held the monies of Client in March 2010 had ever received TARP (Troubled Asset Relief Program) or taken any Federal monies prior, during, or after the financial crisis and to date all remain solvent. It is stated however that it was necessary for Defendant to take TARP monies and purchase the Subsidiary to prevent its certain and inevitable insolvency.

35. Plaintiff's Client then submitted to Defendant collateral assignment paperwork to satisfy the loan requirement from companies such as OppenheimerFunds, where assets were currently held, but were again told no.

36. The collateral assignment paperwork from most companies such as Oppenheimerfunds, UBS, Wells Fargo, and NewBridge Securities are seemingly identical to that of the Merrill Lynch and provide for the exact same protection that

Defendant's Subsidiary provides to protect any loan in case of a default.

37. Defendant has argued that these other firms listed in paragraph 36 were not to be trusted with their collateral assignment paperwork for fear of possibilities they would not follow it or assign the monies of Client multiple times over and that the monies would be much safer being held at its Subsidiary.

38. Defendant never placed any limitations on what could be bought or sold in the portfolio of bonds the Plaintiff managed nor was there any limitations on reporting other than a monthly statement. Plaintiff in fact made many changes to the Client's portfolio and never once asked permission from the Defendant or advised them of these changes prior to or after making them.

39. Defendant's Employee(s) have admitted that there would be some form of compensation given to them by Defendant by requiring the assets to move to the Subsidiary after the transfer was complete.

40. By forcing the assets to their Subsidiary, the Defendant would now receive revenue from both the syndicated loan and fees for being the Administrative Agent on the loan but furthermore the Defendant would add to their bottom line the fees incurred from Client for the management of the $45,000,000 to $70,000,000 in assets under management that Plaintiff managed.

41. Plaintiff alleges and will prove that revenue generation for both the Defendant and its Employee(s) are the sole reason for the requirement that the assets he managed were forced to move to Defendant's Subsidiary as the loan was approved on its own merit without the assets but only a requirement that if Maritz bought out the

minority shares of Client from American Express.

42. Plaintiff will also prove how the Client assets would be no more secure at Subsidiary than they would have been elsewhere.

43. On or about a month after Plaintiff was employed by Defendant he received an email from Defendant's Employee(s) requesting him to input a referral into the Defendant's computer system for the Client account

44. Plaintiff refused to do so as he did not understand why he would input a referral into the system for a client he managed for some six (6) continuous years prior.

45. Plaintiff then made mention in a response email, which was sometime in April 2010, to Defendant's Employee(s) with his Immediate Supervisors copied in on stating his belief that the Defendant illegally tied his Client's assets to the loan.

46. Plaintiff was immediately told not to put anything about his allegations in writing again by Defendant's Employee(s).

47. In February of 2011 Defendant Employee(s) made an unsolicited call to Plaintiff stating that there were other companies trying to bid on the Client's assets that the Plaintiff managed and if they were successful they would have to let the assets leave to the other company. This turned out to be inaccurate after Plaintiff investigated the matter with the Client to find out that no such bidding had ever occurred.

48. In October of 2011 Plaintiff resigned from Defendant's Subsidiary for reasons stated in this action and other reasons not relevant to this action.

49. Prior to Plaintiff's resignation it became well known that the Client assets he managed needed to be released from the collateral assignment.

50. Defendant has stated the reason for the impending release was because of the improvement of Maritz's finances.

51. The Plaintiff will prove the reason listed in paragraph 50 to be false. The reason the assets had to be released from collateral assignment is because the assets should have never been assigned in the first place. The monies that were collaterally assigned were already spoken for as an outstanding balance on the general public's gift cards that had been purchased but not used as of yet.

52. Immediately following the resignation of Plaintiff the Defendant's Employee(s) informed Maritz and again threatened that the assets the Plaintiff had managed for eight (8) years were not to be moved with him to his new Broker/Dealer or they would immediately put the loan into default.

53. There were numerous other times that Defendant Employee(s) impeded the Plaintiff's ability to perform duties asked from him by the Client and Maritz. These impediments prevented Plaintiff from doing what was best for his client and Maritz and limited the returns that were possible for them both on their monies.

54. Before, throughout, and after the Plaintiff's career with Defendant and its Subsidiary, Defendant's Employee(s) were securities licensed and dually employed with Defendant and its Subsidiary.

55. Plaintiff will prove to the Court that the forcing of the Client assets the Plaintiff managed to the Defendant's Subsidiary was nothing more than a revenue grab by the Defendant. Collateral assignments are done often among financial institutions that are not Subsidiaries or affiliates of each other to secure loans. The one act of forcing a

non-traditional bank product to be held at a Subsidiary is where the violation of the Act occurred. The reason the law exists is to prevent just such actions where a "Too Big to Fail " institution such as Defendant can prejudice competition from the market place because a loan was done and therefore prevent any competition.

56. Plaintiff demands trial by jury on all issues so triable.

Wherefore, Plaintiff prays this Court award judgment in his favor against Defendant for compensatory damages including back pay, front pay and damages for emotional distress, pain and suffering and mental anguish, punitive damages, pre and post judgment interest, any possible future attorney's fees, costs and such other relief as this Court deems proper.

**COUNT II**
Libel

57. Plaintiff realleges paragraphs 1-15 as fully alleged herein.

58. In March of 2010 an employee of the Defendant's Subsidiary and Defendant, Maurice Schutte ("therefore and herein will be referred to as Defendant's Employee"), committed Libel against Plaintiff.

59. Defendant Employee was promised the ability to manage Plaintiff's Client upon the mandatory transfer of Client's assets by Defendant's Employee(s).

60. Defendant Employee had never spoken with the Client but felt he was entitled to the account because of the promise made to him for the management by Defendant's Employee(s).

61. It became clear to Defendant Employee in early March of 2010 that Plaintiff was hired by the Defendant's Subsidiary and had transferred the Client's account over to the Subsidiary in Plaintiff's name as Financial Advisor.

62. Defendant Employee then sent an email to an employee of BlackRock (a financial institution that sells bonds and mutual funds) stating that Plaintiff was engaging in unethical behavior and that he was still confident in getting Client account put into his name.

63. Plaintiff tried to engage in doing business with BlackRock for the Client account shortly after he became employed with Defendant but ran into many obstacles in doing so, with one of the reasons being stated in paragraph 62.

64. At the time of the false allegation made against Plaintiff in paragraph 62, BlackRock was an affiliate of the Defendant.

65. Defendant Employee has since admitted that the defamation he made against Plaintiff was false and that he had no knowledge of Plaintiff ever engaging in unethical behavior.

66. Throughout Plaintiff's employment with Defendant there were numerous other cases of written defamation from Defendants Employee(s) towards Plaintiff.

67. In 2013 Defendant made a written accusation against Plaintiff to an independent panel of arbitrators for the Financial Industry Regulatory Industry (FINRA) where it was stated that Plaintiff threatened the lives of Defendant's Employee(s) after his resignation.

68. This allegation stated in paragraph 67 was made by Defendant with

full knowledge it was false as the Defendant's own security investigation completed in 2012 concluded that Plaintiff made no such threat.

69. Plaintiff believes there are many more cases that Libel was committed against him and believes these will be proven after the discovery process.

70. Plaintiff demands trial by jury on all issues so triable.

Wherefore, Plaintiff prays this Court award judgment in his favor against Defendant for compensatory damages including back pay, front pay and damages for emotional distress, pain and suffering and mental anguish, punitive damages, pre and post judgment interest, any possible future attorney's fees, costs and such other relief as this Court deems proper.

## COUNT III
### Slander

71. Plaintiff realleges paragraphs 1-15 as fully alleged herein.

72. There are numerous occasions by Defendant's Employee(s) where they slandered the Plaintiff to Maritz and or Client over the course of his employment with the Defendant and after.

73. One occasion was after Plaintiff resigned. As stated in paragraphs 67 and 68 the Defendant's claim was proven false by their own security investigation, Defendant's Employee(s) fully knowing this statement was false went on to state to Maritz officers that Plaintiff made these false threats to Employee(s) of Defendant.

74. This single slanderous statement proved detrimental to Plaintiff's relationship with his Client and Maritz. The false statement caused irreparable harm to

the relationship which in turn is the primary reason the Plaintiff no longer has the ability to manage the Client assets as there was direct testimony from Client stating any mention of Plaintiff's name and the possibility of him ever managing the Client account would be political suicide.

75. There are numerous other instances throughout Plaintiff's employment with Defendant that the same Defendant Employee(s) made defaming statements about Plaintiff to Maritz, Client, and other employees of Defendant and Defendant's Subsidiaries which will be easily proven.

76. Plaintiff demands trial by jury on all issues so triable.

Wherefore, Plaintiff prays this Court award judgment in his favor against Defendant for compensatory damages including back pay, front pay and damages for emotional distress, pain and suffering and mental anguish, punitive damages, pre and post judgment interest, any possible future attorney's fees, costs and such other relief as this Court deems proper.

## COUNT IV
### Harassment

77. Plaintiff realleges paragraphs 1-76 as fully alleged herein.

78. Defendant through its Employee(s) and Supervisors repeatedly engaged in threats and harassment against Defendant.

79. The above described unwelcome harassing conduct created an intimidating, oppressive, hostile and offensive work environment that interfered with the

Plaintiff's ability to continue to maintain his relationship with his Client and Maritz.

80. The Defendant's Employee(s) made no attempt to hide through emails and verbal assaults towards Plaintiff that they would do anything to prevent him from maintaining a relationship with his Client throughout his employment.

81. On many occasions there are emails from Defendant's Employee(s) that speak of them trying to poach Plaintiff's Client from him throughout his Employment with Defendant's Subsidiary.

82. As a direct and proximate result of Defendant's willful, knowing and intentional harassment against him, Plaintiff has suffered and will continue to suffer pain and suffering, extreme and severe mental anguish and emotional distress and he has suffered and will continue to suffer a severe loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

83. Plaintiff is informed, believes, and has evidence, and based thereon alleges, that the outrageous conduct of the Defendant and its Employee(s) described in all above was done with fraud, oppression and malice, with a conscious disregard for his rights and with the intent, design and purpose of injuring him. Plaintiff is further informed and believes that Defendant, through its officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct of its employees and managers. By reason thereof, Plaintiff is entitled to punitive or exemplary damages from Defendant in a sum according to proof at trial.

84. Plaintiff demands trial by jury on all issues so triable.

Wherefore, Plaintiff prays this Court award judgment in his favor against Defendant for compensatory damages including back pay, front pay and damages for emotional distress, pain and suffering and mental anguish, punitive damages, pre and post judgment interest, any possible future attorney's fees, costs and such other relief as this Court deems proper.

## CONCLUSION

85. Plaintiff tried resolving Count I of these matters recently in a FINRA arbitration. This was his only course of action by contract obligations against the Subsidiary.

86. Defendant's Subsidiary's Counsel fought vigorously to have anything regarding actions against Defendant dismissed or not heard as Defendant is a non FINRA member. The consistent argument that the Defendant and its Subsidiary being two totally different companies shed a new light on their ability to blame one another for wrong doings and never taking responsibility for what transpires even though they work in consort.

87. Defendant's Subsidiary's Counsel stated many times to FINRA and Plaintiff that Plaintiff's only course of action against Defendant or Defendant's Employee(s) was in Federal Court.

88. Plaintiff through previous discovery and testimony under oath of Defendant's Employee(s) shall be able to solidify the majority of the allegations he has alleged herein and believes through a new discovery process that more evidence against

the Defendant will be unveiled.

89. Plaintiff will prove at trial that this is a case based purely of the Defendant and Defendant's Employee(s) doing nothing more than trying to enrich themselves greedily at the Plaintiff's expense.

90. Plaintiff believes that there is a great possibility that more harm has been done against him outside of what is alleged herein. Plaintiff will therefore seek leave of Court to amend this Complaint if through the discovery process these beliefs prove out. Plaintiff also requests that if and when he hires Counsel that attorneys' fees and costs be awarded pursuant State law.

Date: February 10, 2014

Respectfully submitted,

P. Ry Bray

Patrick Ryan Bray (Pro se)
4007 Riverview Blvd.
Bradenton, FL 34209
Ph. 941-812-9007
pryanbray@msn.com