UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| PATRICK RYAN BRAY, | |
| Plaintiff, | |
| v. | No. 8:14-cv-00332-SDM-TBM |
| BANK OF AMERICA, | **Dispositive Motion** |
| Defendant. | |

**DEFENDANT BANK OF AMERICA, N.A.'S
MOTION TO DISMISS**

Defendant Bank of America, N.A. ("BANA"), improperly named as "Bank of America,"[1] by its undersigned attorneys, hereby moves the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff Patrick Ryan Bray's ("Bray") Complaint with prejudice. Bray has failed to state a claim upon which relief can be granted.

**I. INTRODUCTION**

Bray claims he is entitled to lost brokerage commissions because BANA required a securities account that he managed as an independent financial advisor to be transferred to BANA's broker-dealer affiliate to safeguard the account as collateral for a line of credit. The affiliate, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), hired Bray so that he could continue managing the securities for the client. Eighteen months later, Bray resigned from Merrill Lynch assuming the account would follow him to his new employer. The client, however, chose to keep the account with Merrill Lynch.

---

[1] No legal entity named "Bank of America" exists. Rather, the correct party is Bank of America, N.A.

Bray has filed this lawsuit in a last-ditch effort to breathe new life into the far-fetched antitrust, tort, and contract claims that he fully litigated – and lost – against his former employer, Merrill Lynch, in a Financial Industry Regulatory Authority (FINRA) arbitration action.[2]  Bray's claims were doomed in the FINRA action, and they are doomed now.

Bank of America recognizes that, as a pro se litigant, Bray is entitled to some leeway in pleading.  Lopez v. United States, 5:11-cv-57-Oc-23PRL, 2013 U.S. Dist. LEXIS 121825, at *4 (M.D. Fla. Aug. 27, 2013) (Merryday, J.).  Nevertheless, "a pro se litigant is not relieved of his obligation to allege sufficient facts to support a cognizable legal claim." Id.  Even under the most generous reading of Bray's Complaint, it cannot survive a motion to dismiss for at least three reasons.

First, Bray does not have standing to assert a claim against BANA under the anti-tying provision of the Bank Holding Company Act, 12 U.S.C. § 1972(1) (the "Anti-Tying Statute"). Bray was neither a customer nor a direct competitor of BANA.  Rather, he was a distant link in the chain of commerce, far removed from the antitrust violation he alleges.  The indirect injury Bray alleges he suffered – lost brokerage commissions – is not the kind of loss Congress intended the Anti-Tying Statute to redress.

Second, Bray's defamation claims fail as a matter of law.  According to Bray's own allegations, two of the three statements on which he predicates these claims occurred outside of the statute of limitations.  The one statement that is within the statute of limitations is not attributable to BANA, and, even if it were, it is absolutely privileged, as it was made by attorneys for Merrill Lynch during the FINRA arbitration.

---

[2] Bray was never an employee of BANA and BANA was not a party to the FINRA arbitration.

Third, Bray's "harassment" claim, which is a recast of the "constructive discharge" claim he brought against Merrill Lynch in the FINRA action, is not legally actionable. Bray does not allege that the "hostile work environment" to which he was allegedly subjected was based on sex, race, national origin, or any other protected characteristic. To the extent Bray asserts a claim for intentional infliction of emotional distress, this claim also fails, as the conduct Bray attempts to impute to BANA is not, as a matter of law, actionable.

## II.   STATEMENT OF RELIEF REQUESTED

Taking all of Bray's allegations as true, Bray has failed to state a claim upon which relief can be granted. Accordingly, BANA respectfully requests that Bray's Complaint be dismissed with prejudice.

## III.   FACTUAL BACKGROUND

### A.   Bray, a Financial Advisor, Begins Managing AEIS's Assets in 2004.

In 2004, Bray, a financial advisor, began managing the assets of American Express Incentive Services, LLC ("AEIS").[3]  Complaint ¶ 7. At the time, Bray was an independent financial advisor, affiliated with Newbridge Securities Corporation ("Newbridge"). See id. AEIS's assets were held exclusively in bond mutual funds, and Bray's management of these assets comprised the majority of his business. Id. ¶¶ 7, 9. Bray was not, nor has he alleged that he was, an employee, officer, shareholder, or owner of AEIS.

### B.   Maritz, Which Had a Credit Agreement with a Six-Bank Lending Syndicate of Which BANA Was the Administrative Agent, Seeks to Purchase AEIS.

AEIS was a joint venture in which Maritz, LLC ("Maritz") owned a 51% interest and American Express Company ("American Express") owned a 49% interest. Id. ¶¶ 10, 22. Maritz maintained a revolving line of credit with a six-bank lending syndicate, of which BANA was the

---

[3] AEIS eventually changed its name to InteliSpend Prepaid Solutions, LLC ("InteliSpend"). Complaint ¶ 7.

administrative agent.  Id.  In early 2010, Maritz sought to buy out American Express's minority interest in AEIS and, in connection with that purchase, to modify the terms of its credit agreement with the six-bank syndicate.  Id. ¶ 25.

### C. BANA, as Administrative Agent of the Lending Syndicate, Requires Maritz to Pledge AEIS's Assets as Collateral for an Extension of Credit.

The lending syndicate approved Maritz's purchase of AEIS and agreed to modify the terms of Maritz's credit agreement.  See id. ¶ 23.  As a precondition, however, the syndicate required Maritz to pledge AEIS's assets (the same assets Bray managed at Newbridge) as collateral for the amended credit facility.  Id. ¶¶ 23, 35-36.  Because AEIS's assets were held exclusively in bond mutual funds (i.e., in securities rather than cash or property), BANA, which is not a broker-dealer, could not directly hold the assets as collateral.  See id. ¶ 7, 23.  Thus, BANA, in its role as administrative agent, and with approval from the other syndicate banks, required Maritz to move AEIS's assets to BANA's broker-dealer affiliate, Merrill Lynch, to be held as collateral there.  Id.

BANA required the AEIS assets to be moved to Merrill Lynch for three reasons, all of which went directly to BANA's need – and duty – to safeguard the assets as collateral.  Id. ¶¶ 27, 33, 37.  First, BANA needed to monitor the collateral to ensure that it would not be mismanaged.  Id. ¶ 27.  Second, BANA needed to avoid the risk of a non-affiliate failing to honor the terms of a collateral assignment agreement or, worse, going bankrupt.  Id. ¶¶ 27, 33.  Third, if a non-affiliate held the assets, they could easily be subject to assignment (potentially multiple times over) unbeknownst to BANA, thereby hindering or completely foreclosing BANA's right to the assets.  Id. ¶ 37.  These reasons were especially important in light of the precarious state of financial firms in early 2010 and in light of BANA's fiduciary duty to the other syndicate institutions to ensure that the credit it was extending to Maritz was sound.  See id. ¶¶ 20-21, 33.

4

After Maritz purchased AEIS, AEIS changed its name to InteliSpend.  Id. ¶ 7.  Maritz moved InteliSpend's assets to Merrill Lynch, and BANA entered into a control agreement with InteliSpend and Merrill Lynch, giving BANA control over the assets so they could not be sold or otherwise compromised.  See id. ¶¶ 23, 25.

      **D.**      **InteliSpend Requests that Merrill Lynch Hire Bray as a Financial Advisor.**

InteliSpend asked Merrill Lynch to offer employment to Bray so that he could continue managing the assets.  Id. ¶ 11, 26.  Merrill Lynch hired Bray effective March 1, 2010.  Id. ¶ 4.  Upon his hire, Merrill Lynch provided Bray a loan secured by a promissory note in the amount of $395,805.  Bray managed InteliSpend's assets for the duration of his employment with Merrill Lynch.  Id. ¶¶ 11, 15, 6, 47-49, 52.

      **E.**      **A Merrill Lynch Employee Allegedly Defames Bray.**

According to Bray, in March 2010, Maurice Schutte ("Schutte"), a Merrill Lynch financial advisor, made defamatory remarks about Bray.  Id. ¶¶ 58-62.  As Bray alleges, Schutte was promised the InteliSpend account before Bray was hired.  Id.  After learning that Merrill Lynch hired Bray to manage the InteliSpend account, Schutte allegedly sent an email to BlackRock, an investment management company, questioning Bray's ethics.  Id.

      **F.**      **Bray Voluntarily Resigns from Merrill Lynch After Hearing that the InteliSpend Assets Were to Be Released as Collateral.**

In or about October 2011, Bray learned that the banking syndicate planned to amend Maritz's credit agreement once again and that the syndicate intended to release the InteliSpend assets held as collateral because Maritz's financial condition had improved.  Id. ¶¶ 49-50.  Bray resigned from Merrill Lynch on October 28, 2011, assuming the assets would follow him to his new employer.  Id. ¶¶ 49-50, 52.  BANA released the assets as collateral after Bray resigned, but Maritz/InteliSpend opted to keep the assets at Merrill Lynch.  Id. ¶¶ 52-53.

5

    **G.    After Bray Resigns from Merrill Lynch, Bode, Knopf, and Watson Allegedly Defame Bray to Maritz.**

According to Bray, in or around the time he resigned from Merrill Lynch in October 2011, Bode, Knopf, and Watson defamed Bray when they allegedly told officers at Maritz that Bray had threatened the lives of BANA employees.  Id. ¶¶ 67, 72-73.

    **H.    Merrill Lynch Pursues a FINRA Arbitration Action Against Bray to Collect the Outstanding Balance of the Promissory Note.  Bray Asserts (and Loses) a Claim under the Anti-Tying Statute and Other Claims against Merrill Lynch.**

Bray left Merrill Lynch owing $335,491.88 on the promissory note that he signed at the outset of his employment.  See **Exhibit "A"** (Orders and Judgments in Merrill Lynch, Pierce, Fenner & Smith, Incorporated v. Patrick Ryan Bray, 13-cv-02982, M.D. Fla.).[4]  Despite demand, Bray did not repay the note balance.  Id.  Merrill Lynch initiated a FINRA arbitration action against Bray on January 6, 2012, to collect the outstanding balance.  Complaint ¶ 85.  In the FINRA action, Bray asserted various counterclaims against Merrill Lynch, including – exactly as he now asserts against BANA – a claim for violation of the Anti-Tying Statute, as well as claims for "constructive discharge," breach of contract, breach of fiduciary duty, tortious interference, and violation of FINRA rules.  Id. ¶¶ 85-87; **Exhibit "B"** (FINRA Award) at 2.

An eight-day FINRA arbitration hearing was held from November 4 to 13, 2013.  **Exhibit "B"** at 5.  Bray was represented by two law firms.  Id. at 1.  According to Bray, during the course of the arbitration, attorneys for BANA (which was not a party to the arbitration) made "a written accusation against [Bray] to [the] panel of arbitrators . . . where it was stated that [Bray] threatened the lives of [BANA's] [e]mployee(s) after his resignation."  Complaint ¶ 67.

---

[4] The Court may take judicial notice of undisputed facts of public record in context of deciding a 12(b)(6) motion.  See, e.g., Spasojevic v. Wells Fargo Bank, N.A., 8:13-cv-2923-T-23TBM, 2014 U.S. Dist. LEXIS 7174, at *1-2 (M.D. Fla. Jan. 21, 2014) (Merryday, J.) (taking judicial notice of undisputed facts of public record).

6

On November 12, 2013, after seven days of evidence and testimony from fourteen witnesses (including four expert witnesses) called by Bray, Bray rested his case, whereupon Merrill Lynch moved for a directed verdict.[5]  **Exhibit "B"** at 3.  The arbitration panel granted Merrill Lynch's Motion for Directed Verdict as to Bray's claim under the Anti-Tying Statute.  Id.

Just over a week after the hearing concluded, the arbitration panel issued an Award, which denied Bray's remaining claims and awarded Merrill Lynch the $335,491.88 balance of the promissory note, plus pre-award interest ($20,254.98), and attorney's fees.  Id.  Merrill Lynch received a judgment from this Court confirming the FINRA arbitration award in full and denying Bray's motion to vacate the arbitration award.  See **Exhibit "A."**

## IV.  LEGAL ARGUMENT

### A.  Legal Standard for Motions to Dismiss

In deciding a motion to dismiss, a court should accept the allegations within the complaint as true and construe them in a light most favorable to the non-moving party.  Lopez v. United States, 5:11-cv-57-Oc-23PRL, 2013 U.S. Dist. LEXIS 121825, at *4 (M.D. Fla. Aug. 27, 2013) (Merryday, J.).  However, a court must dismiss a complaint on a 12(b)(6) motion "when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  Id.  Bray's factual allegations, even under the most generous reading, cannot support the claims he asserts.  Bray's Complaint, therefore, should be dismissed with prejudice.

---

[5] Pre-hearing dispositive motions are generally not permitted in FINRA arbitrations.  See **Exhibit "C"** (Copy of Rule 13504 of the FINRA Code of Arbitration Procedure for Industry Disputes).

**B.     Bray Has No Standing to Assert a Claim Against BANA Under the Anti-Tying Statute.**

*1. Bray Was Neither a Customer Nor a Direct Competitor of Bank of America.*

The Anti-Tying Statute prohibits banks from engaging in anti-competitive practices that require bank customers to accept an undesired product or service to obtain a desired loan or more favorable terms on a loan.  12 U.S.C. § 1972(1) (2012); Baggett v. First Nat'l Bank, 117 F.3d 1342, 1346 (11th Cir. 1997).  The Anti-Tying Statute, however, does not prevent banks from requiring – and taking measures to adequately safeguard – collateral on the loans they make. Highland Capital v. Franklin Nat'l Bank, 350 F.3d 558, 565 (6th Cir. 2003); Palermo v. First Nat'l Bank & Trust Co., 894 F.2d 363, 369 (10th Cir. 1990); Tose v. First Pa. Bank, N.A., 648 F.2d 879, 897 (3d Cir. 1981); Bank of Am., N.A. v. GREC Homes IX, LLC, 13-21718-CIV-ALTONAGA/Simonton, 2014 U.S. Dist. LEXIS 8316, at *50 (S.D. Fla. Jan. 23, 2014); see also Federal Reserve Board, Legal Interp. Ltr. re Merrill Lynch Bank USA 2 (Feb. 2, 2004) (finding bank's requirement that securities pledged as collateral be held in account of bank's broker-dealer affiliate did not violate Anti-Tying Statute), attached hereto as **Exhibit "D."**

Courts have limited the class of plaintiffs who may pursue a claim under the Anti-Tying Statute to customers and direct competitors of banks.  See, e.g., Campbell v. Wells Fargo Bank, N.A., 781 F.2d 440, 442-43 (5th Cir. 1986) (dismissing tying claim of non-customer on 12(b)(6) motion for lack of standing, noting it likely that "under general principles of standing, most non-customer injuries will be too remote to furnish a basis for recovery under the act"); Prof'l Title LLC v. FDIC, 5:10-cv-72/RS-EMT, 2011 U.S. Dist. LEXIS 29194, at *4-5 (N.D. Fla. Mar. 9, 2011) (dismissing tying claim on 12(b)(6) motion because plaintiffs were not direct competitors of defendant bank); Omega Homes, Inc. v. Citicorp Acceptance Co., 656 F. Supp. 393, 401-02 (W.D. Va. 1987) (dismissing tying claim on 12(b)(6) motion, finding that standing under Anti-

8

Tying Statute to be conferred only upon those who have suffered direct injury, which includes "defendants' competitors in the same market in which trade is restrained" or "consumers of the affected product or services"). Indeed, BANA knows of no case in which a court found anyone other than a customer or direct competitor of a bank to have standing to sue under the Anti-Tying Statute.[6]

Courts do not extend standing under the Anti-Tying Statute beyond customers or direct competitors, because doing so would not serve the congressional intent of the statute, which is to "promote competition and to protect *consumers*." Omega, 656 F. Supp. at 402 (emphasis added) (citing United States v. Topco Associates, Inc., 405 U.S. 596, 610 (1962)); see Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 530 (1983) (analyzing nearly identical provision of Clayton Act and noting that "[t]he legislative history of the section shows that Congress was primarily interested in creating an effective remedy for consumers").[7] Moreover, expanding the class of permissible plaintiffs beyond customers and direct competitors

---

[6] See, e.g., Mid-State Fertilizer Co. v. Exch. Nat'l Bank, 877 F.2d 1333, 1334-37 (7th Cir. 1989); Amerifirst Props, Inc. v. Fed. Deposit Ins. Corp., 880 F.2d 821, 825-26 (5th Cir. 1989); Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Assoc., 840 F.2d 653, 659-61 (9th Cir. 1988); Campbell, 781 F.2d at 443; Prof'l Title LLC, 2011 U.S. Dist. LEXIS 29194 at *4-5; Stefiuk v. First Union Nat'l Bank, 61 F. Supp. 2d 1294, 1298 (S.D. Fla. 1999); Shipp v. Donaher, 09-2475, 2010 U.S. Dist. LEXIS 28409, at *26-29 (E.D. Pa. Mar. 25, 2010); Marian Bank v. Elec. Payment Servs., Inc., 95-614-SLR, 1997 U.S. Dist. LEXIS 11560, at *16 (D. Del. Feb. 5, 1997); Omega; 656 F. Supp. at 403; Shulman v. Cont'l Bank, 513 F. Supp. 979, 984-85 (E.D. Pa. 1981); Connell v. E. River Sav. Bank (Riverbank America), 285 N.J. Super. 351, 361-364 (N.J. Super. Ct. App. Div. 1995); Halverson v. Tenn. State Bank, C.A. 154, 1989 Tenn. App. LEXIS 205, at *7 (Tenn. Ct. App. 1989); Delta Diversified, Inc. v. Citizens & S. Nat'l Bank, 171 Ga. App. 625, 627 (Ga. Ct. App 1984).

[7] The class of persons entitled to maintain a private damages action under the Sherman Antitrust Act is defined in § 4 of the Clayton Act, 15 U.S.C. § 15, which is all but identical to the private damages provision of the Anti-Tying Statute, 12 U.S.C. § 1972. Campbell, 781 F.2d at 443. The Eleventh Circuit has held that "the purpose and effect of § 1972 is to apply the general principles of the Sherman Antitrust Act prohibiting anti-competitive tying arrangements specifically to the field of commercial banking." Parsons Steel, Inc. v. First Ala. Bank of Montgomery, N.A., 679 F.2d 242 (11th Cir. 1982). Thus, courts commonly analyze standing under the Anti-Tying Statute the same way they analyze standing under the Clayton and Sherman Acts. See, e.g., Campbell, 781 F.2d at 443.

would invite gratuitous lawsuits by every participant in the chain of commerce indirectly affected by an alleged tying violation, thereby expanding the scope of anti-tying litigation beyond judicially manageable limits.  Campbell, 781 F.2d at 443; Omega, 656 F. Supp. at 401, 402; see Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial, 604 F.3d 1291, 1298 (11th Cir. 2010) ("Read broadly, this provision [§ 4 of the Clayton Act] would open the courts to entirely remote or speculative claims not in furtherance of the antitrust laws."); Pierson v. Orlando Reg'l Healthcare Sys., 619 F. Supp. 2d 1260, 1275, 1277-78 (M.D. Fla. 2009) (requiring antitrust plaintiffs to be "efficient enforcers" of antitrust laws).

Bray does not – and cannot – allege that he was a customer of BANA, or even that he was employed by, or exercised any ownership in, a BANA customer.  Nor does he allege that he was a direct competitor of BANA.  Indeed, Bray could not allege this, as he was never in the business of extending lines of commercial credit to customers.  See Complaint ¶ 11 (alleging Bray was an independent financial advisor).  In fact, Bray's allegations show him to be precisely the sort of remote link in the chain of commerce affected *indirectly* – if at all – by the purported tying violation he alleges.  As such, he should not, for fear of intractably broadening the scope of antitrust litigation, be conferred standing to sue under the Anti-Tying Statute.  Indeed, if Bray is found to have standing, then why not AEIS/InteliSpend's other suppliers, or Bray's suppliers, or the suppliers' suppliers?  Because Bray does not have standing to bring suit, his claim under the Anti-Tying Statute should be dismissed.

### 2. Bray's Alleged Lost Commissions Are Indirect, Speculative, and Not the Type of Loss the Anti-Tying Statute Was Intended to Redress.

Bray's alleged injury – lost brokerage commissions resulting from the buyout of a client that he serviced by a company who happened to be a customer of BANA – is not the type of injury that

the Anti-Tying Statute was intended prevent.  To the extent Bray has alleged an injury connected to a tying violation at all (which he has not), this injury would belong to Maritz, not Bray.

Courts determine standing under the Anti-Tying Statute by looking at the nature of the plaintiff's alleged injury, the directness of the injury's connection to the alleged wrongdoing, and whether a party other than the plaintiff exists who could more appropriately enforce the statute. See, e.g., Campbell, 781 F.2d at 443; Omega, 656 F. Supp. at 400-03; Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1449-1455 (11th Cir. 1991) (analyzing standing under Clayton Act).  If a plaintiff's injury is not the type of loss the alleged tying violation would be likely to cause, the connection between the plaintiff's injury and the alleged wrongdoing is indirect or speculative, and/or if a party other than the plaintiff exists who could better vindicate the interests protected by the statute, the plaintiff will be precluded from maintaining a suit for lack of standing.  Campbell, 781 F.2d at 443; Omega, 656 F. Supp. at 400-03; see Todorov, 921 F.2d at 1449-50 (plaintiff's injury must "coincide[] with the public detriment tending to result from the alleged violation").

In Omega, a remarkably similar case, the court held that "***lost commissions are not the kind of damages that the tying restrictions are supposed to prevent***."  656 F. Supp. at 401 (emphasis added).  There, Omega, a mobile home retailer and insurance broker, sued Citicorp Bank for violation of the Anti-Tying Statute, alleging that Citicorp unlawfully required customers of Citicorp's mobile home financing to purchase mobile home insurance through one of Citicorp's insurance brokerage subsidiaries, thereby depriving Omega of brokerage commissions.  Id. at 396.  For years, Omega had collected a commission each time an insurance policy that it originally sold to one of its mobile home customers automatically renewed.  Id. Citicorp, however, began requiring its mobile home mortgagors, when their original policy terms

ended, to purchase new policies through Citicorp's insurance brokerage subsidiary, which collected a brokerage fee on each new policy, instead of Omega. Id.

The Omega court granted Citibank's motion to dismiss, finding that Omega lacked standing. Although "it [was] possible that Omega lost insurance brokerage commissions as a result of [Citicorp's] scheme," this alleged injury was not "the type of loss that the claimed violation[] would be likely to cause," and was therefore not redressable under the Anti-Tying Statute. Id. at 401, 403. The court explained, "*middlem[e]n whose losses, if any, are separated by the defendant's actions by the complex marketing and purchasing decisions of the actual participants in the relevant market*" do not have standing to sue under the Anti-Tying Statute. Id. at 402 (emphasis added). As the court noted, although Omega's allegations may have been sufficient to show that Citicorp's purported tying scheme caused injury to the ultimate consumers of Citicorp's mobile home loans, its allegations were not sufficient to show that Omega suffered any direct injury. Id. at 401. Accordingly, Omega was not the appropriate party to bring suit. Id. at 402; cf. Todorov, 921 F.2d at 1451 (alleged injury not actionable where "other independent effects" led to it); Campbell, 781 F.2d at 443 (alleged injury must be "direct consequence of the alleged antitrust violation").

Just as in Omega, Bray's alleged lost brokerage commissions[8] are not the type of loss likely to be caused by a tying violation and are therefore not actionable under the Anti-Tying Statute. Indeed, the damages that Bray alleges are so causally attenuated from the alleged violation, they cannot possibly be deemed a direct consequence of it. Although Bray's allegations, which must be accepted as true for purposes of this motion, arguably show that

---

[8] Bray's specific contention is that, as a result of the alleged tying violation, he "was forced to leave his career as an Independent Financial Advisor" and join Merrill Lynch. Complaint ¶ 11. The "compensatory damages" that Bray seeks for this alleged violation are for lost brokerage commissions.

12

Maritz – an actual participant in the market in which the alleged act of tying would have restrained trade – would have standing, Bray's allegations fail to show that he suffered any direct injury.  Like Omega, Bray was, at best, a middleman at least two steps removed from the actual market participants (i.e., Maritz and BANA) whose interests the Anti-Tying Statute contemplates.  See Complaint ¶¶ 7, 20-25 (alleging that Bray served as a financial advisor servicing AEIS, which in turn was purchased by Maritz, which in turn was a client of BANA).

Bray's allegations make clear that he suffered no direct injury in the wake of Maritz's buyout of AEIS.  First, Merrill Lynch, at AEIS/InteliSpend's request, offered Bray lucrative employment immediately after the buyout so that he could continue servicing the AEIS/InteliSpend account.  Id. ¶¶ 7-8, 11, 26.  Second, to the extent Bray alleges that he suffered injury after voluntarily resigning from Merrill Lynch – almost two years after the alleged tying violation occurred (because the client chose not to follow Bray when he left Merrill Lynch) – such injury was, however unfortunate, entirely incidental and not actionable as to BANA.  See id. ¶¶ 48-52.  Because Bray's alleged loss was so indirect and speculative relative to the tying violation he alleges, his claim under the Anti-Tying Statute should be dismissed.

**C.    Bray's Defamation Claims Fail.**

Bray premises his defamation claims (Count II (Libel) and Count III (Slander)) on the following allegations:

- "In *March 2010* an employee of the Defendant's Subsidiary and Defendant, Maurice Schutte . . . , committed Libel against Plaintiff [when Schutte] sent an email to an employee of BlackRock . . . stating that Plaintiff was engaging in unethical behavior."  Complaint ¶¶ 58, 62 (emphasis added).

- "[A]fter Plaintiff resigned [*in October 2011*,] Defendant's Employee(s) . . . state[d] to Maritz officers that Plaintiff . . . threatened the lives of Defendant's Employee(s)."  Id. ¶¶ 48, 67, 73.

- "In 2013 Defendant made a written accusation against Plaintiff to an independent panel of arbitrators . . . where it was stated that Plaintiff threatened the lives of Defendant's Employee(s) after his resignation." Id. ¶ 67.

Bray alleges that "numerous other" defamatory acts occurred, but he provides no factual support for this conclusion. Id. ¶¶ 66, 75. Therefore, the Court need not accept this allegation as true. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("[C]onclusions . . . are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.")

### 1. *Bray's Libel and Slander Claims Are Time-Barred.*

Bray's defamation claims premised on Schutte's alleged email to BlackRock and the statements BANA's employees allegedly made to Maritz concerning threats that Bray made are time-barred and should be dismissed. The statute of limitations for defamation claims in Florida is two years. Fla. Stat. § 95.11(4)(g) (2013).[9] A motion to dismiss on statute of limitations grounds may be granted if it is apparent from the face of the complaint that a claim is time-barred. United States v. Stricker, 524 F. App'x 500, 505 (11th Cir. 2013).

Bray alleges that Schutte defamed him in March 2010. Complaint ¶ 58. He alleges that BANA's employees defamed him in October 2011. Id. ¶¶ 48, 67, 73. Bray filed this action on February 10, 2014. Accordingly, Bray's claims premised on these statements are outside of the statute of limitations.

### 2. *Even if the Alleged Defamatory Statements Made in the FINRA Arbitration Were Attributable to BANA (Which They Are Not), the Statements Are Absolutely Privileged.*

Bray alleges that BANA defamed him when, during the FINRA arbitration, Merrill Lynch's attorneys stated to the arbitration panel that Bray threatened the lives of BANA's

---

[9] To the extent Missouri law applies to Bray's defamation claims, the result would be the same. See Mo. Rev. Stat. § 516.140 (2013) (providing for two year statute of limitations on defamation claims).

employees. Complaint ¶ 67. However, according to Bray's own allegations, as well as facts of public record, BANA was not a party to the FINRA arbitration; only Bray and Merrill Lynch were. Id. ¶¶ 85-87; **Exhibits "A" and "B."** Thus, these statements cannot be imputed to BANA and are not actionable in this lawsuit. See Pegasus Imaging Corp. v. Northrop Grumman Corp., 07-CV-1937, 2008 U.S. Dist. LEXIS 99985, at *5-7 (M.D. Fla. Nov. 25, 2008) (absent corporate veil-piercing, distinct legal entities cannot be held liable for each other's conduct).

Assuming, *arguendo*, the statements made at the FINRA arbitration were attributable to BANA, they would still not be actionable. Defamatory statements made in the course of arbitration proceedings are absolutely privileged. Kidwell v. Gen. Motors Corp., 975 So. 2d 503, 505 (Fla. 2d DCA 2007); see also Miller v. Support Collection Unit Westchester Cnty., 09-CV-1898, 2010 U.S. Dist. LEXIS 19840, at *19-22 (M.D. Fla. Feb. 9, 2010) (dismissing defamation claim on 12(b)(6) motion where alleged defamatory statement was made during judicial proceeding).[10] To the extent BANA made any statement during the arbitration concerning Bray's threatening BANA's employees (which it did not), these statements cannot serve as the basis of a defamation claim. As such, Bray's defamation claims must be dismissed.

    **D.**    **The "Harassment" Bray Alleges Is Not Actionable.**

Count IV of Bray's Complaint, which he labels "Harassment," alleges that BANA's employees created a hostile work environment that interfered with Bray's ability to maintain his relationship with InteliSpend. Complaint ¶¶ 78-81. If Bray intends to assert a hostile work environment claim pursuant to Title VII or other employment discrimination statute under this Count, such a claim fails as a matter of law for at least two reasons.

---

[10] Missouri law also treats statements made in judicial and quasi-judicial proceedings as absolutely privileged. Barge v. Ransom, 30 S.W.3d 889, 890 (Mo. Ct. App. 2000).

First, Bray does not allege that he exhausted administrative remedies. His claim should be dismissed on this ground alone. See Hearn v. Int'l Bus. Machs., 13-cv-827, 2013 U.S. Dist. LEXIS 141761, at *14-15 (M.D. Fla. Oct. 1, 2013) (granting 12(b)(6) motion where plaintiff failed to exhaust administrative remedies). Second, Bray does not allege that the harassment he allegedly experienced was because of discrimination based on sex, race, national origin, or any other protected characteristic. See Brown v. Snow, 440 F.3d 1259, 1265 (11th Cir. 2006) (explaining that element of prima facie hostile work environment claim is that harassment complained of was based on protected characteristic). Accordingly, Bray's "harassment" claim should be dismissed.

If Bray intends to assert a claim of intentional infliction of emotional distress (IIED), such a claim is equally deficient. Florida has an extremely high standard for IIED claims in the employment context, requiring a plaintiff-employee to allege "relentless *physical*, as well as verbal, harassment" to survive a motion to dismiss. Price v. A-1 Imaging of Orange Park, LLC, 2009 U.S. Dist. LEXIS 68049, at *7-11 (M.D. Fla. Aug. 4, 2009) (emphasis added) (dismissing employee's IIED claim where employee failed to allege employer physically harassed her, noting that "there exists strong disfavor under Florida law toward employment-based claims for IIED").[11]

In DeShiro v. Branch, a plaintiff-employee alleged that her employer consistently made explicit comments to her, forced her to wear clothing with pornographic images on it, fondled her, offered her money for sex, and threatened her with termination if she did not socialize with the employer outside of work. 96-800-CIV-T-17E, 1996 U.S. Dist. LEXIS 16946, at *12-13 (M.D. Fla. Nov. 4, 1996). The court dismissed the employee's IIED claim, deeming that she failed to allege a "*pervasive* pattern of *relentless* physical *and* verbal abuse." Id. at *10-13.

---

[11] See also Gibson v. Brewer, 952 S.W.2d 239, 1004 (8th Cir. 2001) (noting that, to state claim for IIED under Missouri law, plaintiff must allege distress resulting in physical harm).

Similarly, in Golden v. Complete Holdings, Inc., the court found that the defendant-employer's alleged conduct was not, as a matter of law, outrageous enough to survive a motion to dismiss.  818 F. Supp. 1495, 1500 (M.D. Fla. 1993).  There, the plaintiff-employee alleged that the defendant-employer misrepresented vital financial information to the plaintiff-employee, induced him to forgo other employment opportunities, terminated him despite his satisfactory performance, ejected him from his office without an opportunity to collect his personal effects (which the employer destroyed), and refused for months to pay him severance pay and other entitlements.  Id. at 1499.

Bray does not allege that BANA employees physically harassed him.  Indeed, the conclusory allegations in Bray's Complaint fail to approach anything close to the level of severity and outrageousness necessary to survive a motion to dismiss.  See Complaint ¶ 80 (alleging that BANA, "through emails and verbal assaults[,] prevent[ed Bray] from maintaining a relationship with [InteliSpend]").  Accordingly, to the extent Bray's Complaint can be read as asserting an IIED claim, this claim should be dismissed with prejudice.

## V.  **CONCLUSION**

Despite the leeway in pleading afforded Bray as a pro se plaintiff, he has failed to set forth, and cannot set forth, factual allegations sufficient to support the legal causes of action he asserts.  Thus, Bray's Complaint should be dismissed with prejudice.

                                                                 Respectfully submitted,

Date:  March 27, 2014                   /s/ Mahlon H. Barlow
                                                                 Mahlon H. Barlow, Trial Counsel
                                                                  Florida Bar ID # 871117
                                                                  Sivyer Barlow & Watson, P.A.
                                                                  SunTrust Financial Centre
                                                                  401 E. Jackson Street, Suite 2225
                                                                  Tampa, FL 33602
                                                                  Ph. (813) 221-4242
                                                                  Fax. (813) 227-8598
                                                                  MBarlow@sbwlegal.com

                                                                  Janelle E. Fulton (*pro hac vice motion pending*)
                                                                  Florida Bar ID #97920
                                                                 Rubin, Fortunato & Harbison P.C.
                                                                  10 South Leopard Road
                                                                  Paoli, PA 19301
                                                                  Ph. (610) 408-2000
                                                                  Fax. (610) 408-9000
                                                                  jfulton@rubinfortunato.com

                                                                  *Attorneys for Bank of America, N.A.*

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on March 27, 2014, I electronically filed the foregoing Defendant Bank of America, N.A.'s Motion to Dismiss and Supporting Brief and all ancillary documents with the Clerk of Court by using the CM/ECF system and sent a copy of same via electronic and U.S. mail to Plaintiff Patrick Ryan Bray at 4007 Riverview Blvd., Bradenton, Florida 34209 and pryanbray@msn.com.

                                        /s/ Mahlon H. Barlow
                                        Mahlon H. Barlow